UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | |
|---|---|
| DARRYL L. DAVIS, | ) |
| Petitioner, | ) ) ) |
| v. | ) Nos. 3:07-CR-066-RLJ-HBG ) 3:14-CV-299-RLJ-HBG ) |
| UNITED STATES OF AMERICA, | ) ) |
| Respondent. | ) ) |

## REPORT AND RECOMMENDATION

Petitioner previously filed a pro se motion to vacate, set aside, or correct sentence pursuant to 28 U.S.C. § 2255. [Doc. 1].[1] This case has been referred [Doc. 28] by the District Judge to the undersigned for a report and recommendation regarding disposition of Petitioner's claim of ineffective assistance of both his trial and appellate counsel. An evidentiary hearing was held before the Court on July 19, 2021. Assistant United States Attorney Tracy Stone appeared on behalf of the Government. Attorney Mark Brown appeared on behalf of Petitioner, who was also present. For the reasons set forth herein, the Court **RECOMMENDS** that the sole remaining claim in Petitioner's § 2255 motion be **DENIED**.

**I.    BACKGROUND**

On September 15, 2009, a jury convicted Petitioner of committing bank robbery with a dangerous weapon, in violation of 18 U.S.C. § 2113(a) and (d); three counts of using a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c); two counts of interfering with commerce by robbery, in violation of 18 U.S.C. § 1951; possessing a firearm as

---

[1] Unless otherwise indicated, all citations to the record are found on the docket of Case No. 3:14-cv-299-RLJ-HBG.

a convicted felon, in violation of 18 U.S.C. § 922(g)(1); and obstruction and concealment of evidence, in violation of 18 U.S.C. § 1512(c)(1) and 2. [Doc. 100 in 3:07-cr-66]. Petitioner was sentenced to seven hundred-and sixty-two-months imprisonment on November 19, 2010. [Doc. 125 in 3:07-cr-66]. The Sixth Circuit affirmed the conviction and the Supreme Court denied Petitioner's petition for a writ of certiorari. *United States v. Davis*, 515 F. App'x 486, 494 (6th Cir.), *cert. denied*, 570 U.S. 926 (2013). Petitioner was represented by Attorney Steven Shope at trial (his third appointed counsel) and by Attorney Clayton Whittaker on appeal.

Petitioner then filed his § 2255 petition raising four claims for relief on June 27, 2014. [Doc. 154 in 3:07-cr-66]. On July 27, 2017, District Judge Reeves summarily dismissed Petitioner's claims and declined to issue a certificate of appealability. [Doc. 175 in 3:07-cr-66]. However, on October 17, 2019, the Sixth Circuit granted a certificate of appealability on one claim: "Whether trial counsel performed ineffectively by failing to move to suppress the buccal swabs taken from Davis on June 6, 2007, and July 22, 2007, and whether appellate counsel performed ineffectively by failing to argue on appeal that the buccal swabs should have been suppressed." [Doc. 21].

On appeal, Petitioner argued that trial counsel, despite knowing an FBI agent illegally obtained buccal swab sample K1, deliberately refused to file a motion to suppress, which would have been successful. Petitioner also claimed that his appellate counsel was ineffective by failing to challenge the admission of the DNA evidence. The Government filed a motion to remand the case before the Sixth Circuit, maintaining that the DNA evidence was lawfully obtained and that neither trial nor appellate counsel performed ineffectively, but conceding that the District Court should have held an evidentiary hearing.

On June 19, 2020, the Sixth Circuit granted the Government's motion to remand, vacated the District Court's judgment with respect to Petitioner's first claim for relief, and remanded for proceedings solely on this claim. [Doc. 24]. As detailed above, the evidentiary hearing was held on July 19, 2021. The Government presented the testimony of FBI Special Agent Buddy Early. Following the hearing, both parties submitted supplemental briefing. [Docs. 208 and 209 in 3:07-cr-66].

II.     **SUMMARY OF THE TESTIMONY**

During the July 19 hearing[2], the Government first called FBI Special Agent Buddy Early ("Agent Early"). [Doc. 207 at 4]. Agent Early testified that he is currently an FBI agent assigned to the Atlanta division, but was previously assigned to the Knoxville division from 2004 through 2009. [*Id.*]. Agent Early stated that he was the agent involved in investigating Petitioner's case—as he was investigating armed robberies around the city of Knoxville. [*Id.* at 5]. In response to questioning, Agent Early testified that he remembered Petitioner being arrested by the Knoxville Police Department ("KPD") on June 5, 2007 for public intoxication. [*Id.* at 5–6]. Agent Early then confirmed that on June 6, 2007, he collected a buccal swab from Petitioner at the Prosser Road impound lot when Petitioner was collecting his vehicle. [*Id.* at 6]. The Government then introduced as Exhibit 1 the grand jury subpoena that Agent Early executed on June 6, 2007 to obtain a DNA buccal swab from Petitioner's cheek. [*Id.*]. Additionally, the Government introduced as Exhibit 2 a case—*United States v. Shabazz*, 200 F. Supp. 2d 578 (D.S.C. 2002)—which AUSA Stone represented that he relied upon when he advised the FBI that a grand jury subpoena was legally sufficient under the Fourth Amendment to obtain a buccal swab. [*Id.* at 7].

---

[2] The transcript [Doc. 207 in 3:07-cr-66] of the evidentiary hearing was filed on July 29, 2021.

3

Next, Agent Early described the procedure the FBI utilized after obtaining a piece of evidence, stating that after he received a piece of evidence, he would take it back to the office, mark and seal it, and submit it along with the chain of custody to the evidence control unit. [*Id.* at 8]. Agent Early detailed that there is a supervisor, as well as at least one technician that would manage the evidence in and out of the evidence control unit, and that these individuals are the only ones that have access to this evidence. [*Id.* at 8–9]. Agent Early stated that there is documentation of all evidence that is handled, including the movements in and out of the evidence control unit. [*Id.* at 9]. The Government introduced as Exhibit 3 the evidence log for the buccal swab that was obtained on June 6, 2007, which indicated that Agent Early collected the buccal swap at 7:00 p.m. on June 6, 2007 and submitted it into the evidence control unit on June 11, 2007. [*Id.* at 9–11]. Agent Early testified that during this five-day period, the evidence was in a secured location around his office space, in a sealed bag, and that this delay was not unusual depending on his workload. [*Id.* at 11]. Agent Early stated that the FBI lab in Quantico assigned the nomenclature K1 to this June 6, 2007 buccal swab.[3] [*Id.*]. Agent Early reviewed that the evidence control unit, through Sandra Green, shipped K1 to the testing lab at Quantico, Virginia on June 14, 2007. [*Id.* at 13].

Agent Early then testified that from June 5 through June 14, 2007, he led an investigation into several armed robberies in and around Knoxville. [*Id.*]. Agent Early stated that during this period, Petitioner developed as a suspect for the robberies. [*Id.*]. However, Agent Early testified that he had not received the results of the June 6, 2007 buccal swab (K1) during this time period. [*Id.* at 14]. Agent Early stated that Petitioner developed as a suspect due to the evidence that was described at the trial in this matter, including his discovery by June 14, 2007 of numerous armed

---

[3] The Court will hereafter refer to this buccal swab as K1.

4

Case 3:07-cr-00066-TAV-JEM   Document 210   Filed 08/09/21   Page 4 of 19
PageID #: 1463

robberies with a firearm and that Petitioner had a felony conviction for attempted murder of a police officer in Indiana. [*Id.*]. Agent Early testified that during this period, he and AUSA Stone discussed concerns over the state of the law with regard to buccal swaps, that it was an unsettled area of law, and that the stakes were potentially quite high in this case due to the seriousness of the offense and the offender. [*Id.* at 15]. Agent Early stated that AUSA Stone decided to obtain a search warrant for another sample of Petitioner's DNA in case the grand jury subpoena was later challenged. [*Id.*].

The Government then introduced as Exhibit 4 the search warrant application, the search warrant, and the supporting affidavit for a buccal swab. [*Id.* at 16]. Agent Early stated that the search warrant (dated July 19, 2007) gives a description of Petitioner, details that he was being housed at the Blount County Jail, and was returned as executed on July 27, 2007. [*Id.* at 17]. Here, Agent Early testified that the swab was obtained on July 27, 2007. [*Id.*]. Agent Early detailed that he reread the affidavit before his testimony and verified that there is no reference to the K1 swab in the affidavit. [*Id.*]. Rather, Agent Early stated that the affidavit provides a history of the investigation of the armed robberies and the evidence law enforcement had gathered up to this point. [*Id.*]. Additionally, Agent Early confirmed that he had not received the results of K1 at the time of the application for the search warrant. [*Id.* at 17–18].

Next, the Government introduced as Exhibit 5 the chain of custody log for K3—the buccal swab obtained on July 27, 2007. [*Id.* at 18]. Agent Early detailed that the evidence log indicates that the swab was initially received on July 27, 2007 and that it was submitted into the evidence control unit four days later on July 31, 2007. [*Id.* at 18–19]. Agent Early then stated that the K1 sample was returned to the FBI in Knoxville on August 3, 2007. [*Id.* at 20]. Regarding K3, Agent Early detailed that the sample was sent to the FBI lab at Quantico on

5

August 7, 2007, and it was returned on October 19, 2007. [*Id.*]. Agent Early identified the co-case agent David Bukowski's signature on the evidence log, indicating that Agent Bukowski checked out K3 on September 9, 2009 in preparation for trail. [*Id.* at 21]. Similarly, Agent Bukowski checked out K1 from the evidence control unit on September 9, 2009 in preparation for trial. [*Id.*]. At this point, the Government introduced as Exhibit 6 a timeline of the relevant events, and Agent Early testified that it matched his testimony. [*Id.* at 22].

On cross examination, Agent Early stated that he did not testify at Petitioner's trial, as well as that he was the lead case agent, but that any information about what happened on June 5, 2007 at the Weigel's and Mandarin House Restaurant would have came from other officers. [*Id.* at 23–24]. Agent Early testified that he was not sure if the other officers were aware of the name Darryl Davis on June 5, 2007, but that he did not know Petitioner's name on this date. [*Id.* at 24]. When discussing the grand jury subpoena (Exhibit 1), Agent Early confirmed that the subpoena notes for Petitioner to report to the grand jury witness room on June 19, 2007 at 9:00 a.m., but that he took the buccal swab of Petitioner on June 6, 2007. [*Id.* at 24–25]. Agent Early testified that he could not remember if he took the buccal swab at the impound lot or if he went back to the police department. [*Id.* at 25].

Next, Agent Early stated that Petitioner was arrested after June 5, 2007 on the charge of public intoxication and that he believed that Petitioner was released on bond. [*Id.*]. Agent Early stated that he did not remember if he gave Petitioner a ride at any point on June 6, 2007, including whether he took Petitioner to the impound lot. [*Id.* at 25–26]. When asked whether he asked Petitioner to consent to a buccal swab, Agent Early testified that in regular practice, he would ask for consent, but at this point he had the grand jury subpoena in hand. [*Id.* at 26]. Upon questioning about the grand jury process, Agent Early stated that after a grand jury

6

subpoena is obtained requesting evidence, the individual can provide that evidence prior to the date listed in lieu of actually appearing in court. [*Id.* at 26–27]. Agent Early testified that Petitioner provided a buccal swab in compliance with the grand jury subpoena. [*Id.* at 27]. Additionally, Agent Early stated that after Petitioner provided the swab, he believed that Petitioner went home, as he was not in custody. [*Id.* at 28].

Agent Early detailed that a criminal complaint was then executed in Petitioner's case. [*Id.* at 28–29]. The criminal complaint and affidavit were introduced as Exhibit 7. [*Id.* at 29]. Agent Early stated that he executed the affidavit, although he could not remember if he physically typed the document. [*Id.* at 30]. Attorney Brown questioned Agent Early about the language in the affidavit that "[o]n or about June 5, 2007, an officer with the KPD noticed a black male laying in the grass between the Weigel's convenience store and the Mandarin House Restaurant on Gleason Road near Downtown West Boulevard," as well as "[t]he officer approached the suspect." [*Id.* at 30–31]. When asked what crime this individual was suspected of, Petitioner stated that he remembered that the individual was suspicious and acting unusual as he was crouched down behind some bushes. [*Id.* at 31]. Additionally, Agent Early stated that the KPD was aware of several other crimes happening in similar locations, so it sparked the officers' attention. [*Id.*]. Here, Agent Early testified that laying in the grass after dark by a gas station and restaurant led the officers to believe either someone was hurt or something was not quite right. [*Id.*].

Attorney Brown then quoted additional portions of the affidavit to Agent Early, including that "[t]he suspect immediately pulled the hood of his sweatshirt over his head and fled on foot into a wooded area" and "[a] short time later, officers made contact with the black male walking . . . along Gleason Road toward the Mandarin House Restaurant. [*Id.* at 32]. When asked about

7

what reasonable suspicion the officers had, Agent Early stated that it was unusual to see a person walking back to the area where they saw the original suspicious individual, although Agent Early was not with the officers as this was going on. [*Id.*]. The affidavit provides that "Davis admitted he had been drinking and was arrested for public intoxication and resisting arrest." [*Id.* at 33]. However, Agent Early testified that he was not aware what type of testing law enforcement conducted to determine if Petitioner was intoxicated or if Petitioner was charged with resisting arrest. [*Id.*]. Additionally, Agent Early stated he did not remember whether he went to the impound yard with Petitioner or if he told the impound lot to not release the car. [*Id.* at 34].

When questioned about Exhibit 1, Agent Early testified that the K1 swab was obtained on June 6, 2007, and that by the time K3 was obtained, he did not have the results back from Quantico. [*Id.* at 34–35]. Attorney Brown then showed Agent Early a redacted FBI report form the Sixth Circuit Court of Appeals' record, which references a Special Agent at the Blount County Jail on July 22, 2007. [*Id.* at 35]. Agent Early stated that he had never seen this document before, although he later stated that it looked like his initials were on this document. [*Id.*]. Agent Early clarified that he did not remember writing this document. [*Id.* at 36]. Attorney Brown read a portion of the document saying "in the presence of Davis . . . explained to Attorney [ ] in the presence of Davis that the FBI had preliminary results back from the library and that the standards previously collected from Davis via subpoena matched the forensic evidence left at the crime scene." [*Id.* at 36–37]. Here, Agent Early stated that he did not have the official results from K1 back at this time, and while he did not remember the conversation, there was an opportunity that the lab could have communicated with him before the final results were reviewed and submitted. [*Id.*]. However, Agent Early stated that he did not remember whether this occurred in the present case. [*Id.* at 37].

8

Case 3:07-cr-00066-TAV-JEM Document 210 Filed 08/09/21 Page 8 of 19
PageID #: 1467

AUSA Stone then proffered that he attempted to call Attorney Shope as a witness, but that Attorney Shope was suffering from severe health problems which affected his memory. Further, AUSA Stone pointed to portions of the trial transcript of the cross examination of Rhonda Craig, the DNA lab technician at Quantico who tested K1 and K3.

### III. POSITIONS OF THE PARTIES

In his post-hearing brief [Doc. 209], Petitioner claims that "his counsel was ineffective in failing to file a Motion to Suppress the initial buccal swab that was taken from him on June 6, 2007." [*Id.* at 3]. Accordingly, Petitioner maintains that his trial counsel was ineffective because all evidence subsequently obtained was fruit of the poisonous tree and thus subject to suppression. With respect to the first prong of the *Strickland* analysis, Petitioner asserts that the K1 swab was taken pursuant to a grand jury subpoena, which is not a proper method of obtaining such a DNA sample. Petitioner addresses *In re Shabazz*, 200 F. Supp. 2d 578 (D.S.C. 2002) and alleges that the collection of DNA implicates the Fourth Amendment and is not appropriate for a grand jury subpoena. Here, Petitioner points to the Government subsequently obtaining a search warrant as its knowledge that the results of the first DNA swab were subject to suppression. Petitioner argues that "[a]ny competent practitioner would have noticed the Government trying to correct its mistake and moved to suppress the first swab, along with any evidence obtained thereafter." [Doc. 209 at 8].

Petitioner raises several additional issues that he alleges trial counsel should have challenged. Petitioner claims that "[t]here was no reasonable suspicion to stop Davis in the first place." [*Id.* at 5]. Petitioner cites to Agent Early's testimony that he could not state what reasonable suspicion existed for the officer to attempt to stop him on June 5, 2007. Further, Petitioner asserts that law enforcement stopped pursuit after the suspect fled into the woods, and

9

subsequent reasonable suspicion was not established by seeing an individual, not wearing a hooded sweatshirt, walking in the same area. Additionally, Petitioner claims that there was nothing to establish that he was intoxicated at this point. Therefore, Petitioner argues that a motion to suppress the K1 swab would have been successful, and thus his trial counsel was ineffective. Petitioner also claims that although the Government speculated that it was Attorney Shope's strategy not to pursue a motion to suppress based on the identified portion of the trial transcript, it cannot be established that this was trial strategy given the lack of testimony.

With respect to prejudice, Petitioner asserts that the DNA evidence was essential to his conviction as there was no in-person identification due to the suspect wearing a mask. Therefore, Petitioner claims that the "DNA collected from the first buccal swab was critical to connecting him to the mask, hat and other items at the scenes of the robbery." [*Id.* at 13].

The Government first sets forth a timeline of the events following June 5, 2007. [Doc. 208]. Additionally, the Government asserts that Agent Early's affidavit filed in support of the warrant for K3 made no mention of the first swab, K1. While not conceding that K1 was improperly obtained, particularly given the state of the law at the time, the Government contends that K3 was properly obtained pursuant to a search warrant. The Government asserts that "the warrant for the second swab was obtained independent of the first swab" and therefore trial counsel was not ineffective in failing to move to suppress the DNA evidence. [*Id.* at 6]. With respect to appellate counsel, the Government alleges that a review of the affidavit submitted to obtain K3 clearly leads to the conclusion that it was based on probable cause and "because the search warrant affidavit made no mention of K1, there was no possibility that the search warrant was tainted by K1." [*Id.*].

10

## IV. FACTUAL BACKGROUND

The Court finds it helpful to review the factual background of Petitioner's arrest, as well as buccal swabs K1 and K3.[4]

On May 8, 2007, a black male, wearing a ski mask and a Denver Broncos hat, entered the AmSouth Bank in Knoxville, Tennessee, armed with a silver semi-automatic pistol, and robbed the bank. He left with $4,045 in U.S. currency. Shortly after the robbery, officers with the KPD recovered the ski mask and the hat in the parking lot between the AmSouth Bank and the neighboring building.

On May 31, 2007, a black male with a black toboggan pulled down over his face with holes cut out for his eyes, entered the Weigel's convenience store in Knoxville, Tennessee, armed with a silver semi-automatic pistol and robbed the store. Shortly after the robbery, officers of the KPD recovered the black toboggan with the cutout eyeholes near a dumpster next door to the Weigel's store.

One June 3, 2007, a black male, wearing a ski mask, entered the Favorite Market in Knoxville, Tennessee, armed with a silver semi-automatic pistol, and robbed the store. Surveillance photos showed the robber wearing slippers or house shoes.

On June 5, 2007, a KPD officer noticed a black male lying in the grass between the Weigel's convenience store and the Mandarin restaurant in Knoxville. When the officer approached the individual, the individual jumped up, pulled the hood over his head and fled on foot. The officer later saw a black male walking toward the Mandarin restaurant. The officer

---

[4] This factual background is largely taken from District Judge Reeves' order denying Petitioner's § 2255 motion as well as the timeline produced by the Government as Exhibit 6 during the evidentiary hearing—which Agent Early testified was consistent with his testimony. [Doc. 2]; *see Davis v. United States*, No. 3:07-CR-66, 2017 WL 11319711, at *1 (E.D. Tenn. July 27, 2017).

approached this individual who claimed he was not the one who had just fled, but was just walking back to his car, which he claimed had run out of gas at the Mandarin restaurant. This individual was identified as Daryl Davis. He led officers back to his car, which, contrary to what he had represented, had a full tank of gas. Davis then admitted to the officers that he had been drinking and was arrested for public intoxication. Davis was later released on bond for the public intoxication charge.

On June 6, 2007, Agent Early obtained a DNA swab, K1, from Petitioner pursuant to a grand jury subpoena. *See* [Exhs. 1 and 3]. After Petitioner was released on bond, Agent Early met him at the KPD impound lot and obtained the buccal swab from the inside of Petitioner's cheek. The K1 swab was logged into the FBI evidence control unit on June 11, 2007 and sent to the FBI lab in Quantico, Virginia on June 14, 2007. [Exh. 3].

On June 7, 2007, Petitioner was arrested on a criminal complaint charging him with the robbery of the AmSouth Bank and two Hobbs Act robberies of the Weigel's and the Favorite Market, in violation of 18 U.S.C. § 1951(a). [Doc. 1 in 3:07-cr-66]. Petitioner was subsequently indicted on June 12, 2007 for one count of bank robbery, two counts of Hobbs Act robberies, and three counts of using, carrying, or brandishing a firearm in furtherance of crimes of violence. [Doc. 6 in 3:07-cr-66].

On June 19, 2007, the undersigned issued a search warrant for Petitioner's DNA. [Exh. 4]. Law enforcement executed the search warrant on July 27, 2007[5], and K3 was logged into evidence on July 31, 2007. [Exhs. 4 and 5]. The K1 swab was returned from the Quantico lab and logged back into evidence on August 3, 2007. [Exh. 3]. The K3 swab was sent to the

---

[5] The Court notes that District Judge Reeves' order states that K3 was obtained on July 22, 2007.

Quantico lab on August 7, 2007, and it was returned and logged back into evidence on October 19, 2007. [Exh. 5].

V.     ANALYSIS

In pertinent part, Section 2255(a) of Title 28 of the United States Code permits a prisoner in custody under sentence of a federal court to move the court that imposed the sentence to vacate, correct, or set aside the sentence, if "the sentence was imposed in violation of the Constitution." In order to obtain relief for an alleged constitutional error, the record must reflect a constitutional error of such magnitude that it "had a substantial and injurious effect or influence on the proceedings." *Watson v. United States*, 165 F.3d 486, 488 (6th Cir. 1999) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 637–38 (1993)). The burden is on the petitioner to establish the claims arising out of the petition. *Bowers v. Battles*, 568 F.2d 1, 5 (6th Cir. 1977).

When the alleged constitutional error is ineffective assistance of counsel, the petitioner must satisfy the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1987). *Roe v. Flores-Ortega*, 528 U.S. 470, 477 (2000). That is, the petitioner must: (1) establish, by identifying specific acts or omissions, that counsel's performance was deficient and that counsel did not provide "reasonably effective assistance," *Strickland,* 466 U.S. at 687, as measured by "prevailing professional norms," *Rompilla v. Beard*, 545 U.S. 374, 380 (2005); and (2) demonstrate "a reasonable probability that, but for [counsel's acts or omissions], the result of the proceedings would have been different." *Strickland*, 466 U.S. at 694.

The sole remaining claim before the Court at this time is: "[W]hether trial counsel performed ineffectively by failing to move to suppress the buccal swabs taken from Davis on June 6, 2007, and July 22, 2007[6], and whether appellate counsel performed ineffectively by

---

[6] The Court again notes that Agent Early testified that K3 was obtained on July 27, 2007.

failing to argue on appeal that the buccal swabs should have been suppressed." [Doc. 24 at 3]; *see Davis v. United States*, No. 18-6125, slip op. at 7 (6th Cir. Oct. 17, 2019) (order). Therefore, the Court will only address Petitioner's arguments relating to trial counsel's failure to move to suppress K1 and K3.

To collaterally attack a conviction based on ineffective assistance of counsel, Petitioner must establish "that [his] lawyers performed well below the norm of competence in the profession and that this failing prejudiced [his] case." *Caudill v. Conover*, 881 F.3d 454, 460 (6th Cir. 2018) (citing *Strickland*, 466 U.S. at 687). The performance inquiry requires the petitioner to "show that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. There is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. Therefore, the Court should resist "the temptation to rely on hindsight . . . in the context of ineffective assistance claims." *Carson v. United States*, 3 F. App'x 321, 324 (6th Cir. 2001); *see also Strickland*, 466 U.S. at 689 ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.").

Failure to file a suppression motion may amount to ineffective assistance, but it is not ineffective assistance per se. *Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986). To demonstrate ineffective assistance of counsel based on failure to file a motion to suppress, a petitioner must show that counsel's failure fell below an objective standard of reasonableness. *Id.* Additionally, the petitioner must demonstrate that his Fourth Amendment claim is meritorious and that there is a reasonable probability that the outcome would have been

different absent the excludable evidence. *Williams v. United States*, 632 F. App'x 816, 821 (6th Cir. 2015) (citing *Kimmelman*, 477 U.S. at 375). With respect to the alleged failure to file a valid motion to suppress, the Sixth Circuit has also stated that "[t]rial counsel [is] not ineffective for failing to file a motion to suppress that would have been meritless." *Holmes v. United States*, 281 F. App'x 475, 482 (6th Cir. 2008).

There is competing authority regarding whether the taking of DNA evidence pursuant to a buccal swab obtained through a grand jury subpoena (K1) is constitutional. *See Unsworth v. Konteh*, No. 3:06-CV-1856, 2007 WL 4365402, at *12 (N.D. Ohio Dec. 10, 2007) ("DNA samples also may be obtained by means of a grand jury subpoena."); *In re Shabazz*, 200 F. Supp. 2d 578, 585 (D.S.C. 2002) ("A grand jury subpoena duces tecum requiring a saliva swab must be based on reasonable individualized suspicion that petitioner was engaged in criminal wrongdoing."); *In re Grand Jury Proceedings Involving Vickers*, 38 F. Supp. 2d 159, 165–168 (D.N.H. 1998) (although a subpoena requiring a saliva sample implicates the Fourth Amendment, the search and seizure was reasonable); *United States v. Ledbetter*, No. 1:15-cr-080, 2015 WL 7017367, at *1-3 (S.D. Ohio Nov. 12, 2015) (defendant reported to a meeting with law enforcement pursuant to a grand jury subpoena for his fingerprints and DNA sample); *but see In re Grand Jury Proceeding*, 455 F. Supp. 2d 1281, 1286 (D.N.M. 2006) (holding that a grand jury subpoena duces tecum was not the "proper procedural vehicle" in the case because requiring the Government to obtain a valid warrant would not have hindered or delayed the grand jury proceedings). The Court agrees with the Government's contention the Sixth Circuit "has not been squarely presented with the issue for review." [Doc. 208 at 5]. Therefore, the Court cannot conclusively determine that a challenge to a buccal swab obtained by a grand jury subpoena would be meritless.

However, the Court cannot ignore the presence of K3—obtained through a search warrant independent of the identification of the results of the lab testing of K1. District Judge Reeves previously found that "even if [Petitioner's counsel] had filed a motion to suppress swab K1 and prevailed, that would not have addressed swab K3, the one obtained from a validly issued search warrant." [Doc. 2 at 7]. Further, in the opinion, District Judge Reeves relied on the fact that "[t]he analysis of the first swab had not been completed before the Government obtained the warrant and second swab." [*Id.* at 8]. In granting the certificate of appealability on this claim, the Sixth Circuit distinguished that "the district court cited no evidence in support of this finding. Rather, it simply cited the government's unsupported assertion in a footnote contained in its response to Davis's § 2255 motion." [Doc. 21 at 4]. The Sixth Circuit noted that the FBI document submitted by Petitioner "seems to contradict this finding." [*Id.*].

After the evidentiary hearing, the Court finds that the Government has established that the search warrant for K3 did not rely upon the identification of Petitioner from K1, as law enforcement had not received the results of K1 at the time it obtained the search warrant. The affidavit in support of the search warrant for K3 details law enforcement's investigation of the robbery of the AmSouth Bank, including a physical description of the suspect as a black male of slender build and over six feet tall. The affidavit proceeds to describe witnesses observing a black male circling the parking lot of a barber shop located near the AmSouth Bank shortly before the bank robbery, parking in various parking spaces, exiting the vehicle and walking in the direction of the AmSouth Bank, and running back to the car and leaving the scene. Additionally, the affidavit details law enforcement's investigation of the robbery of the Weigel's convenience store and of the Favorite Market. Next, the affidavit reviews KPD's interactions with a black male (later identified as Petitioner) laying in the grass between the Weigel's

16

convenience store and the Mandarin House Restaurant on June 5, 2007 and his subsequent actions detailed above. This individual was identified as Petitioner, a 6'2", 195-pound black male who drove a 1997 Chevrolet Monte Carlo sedan and who lived in close proximity to all three robberies. Lastly, the affidavit detailed Petitioner's criminal history and the June 12, 2007 indictment returned against Petitioner. *See* [Exh. 4]. Significantly, Petitioner does not claim that the search warrant for K3 was lacking in probable cause. Therefore, the Court finds that the search warrant for K3 was not dependent on the identification of the DNA results obtained from K1, as it relied upon independent probable cause. As established by the Government, the search warrant for K3 was obtained on July 19, 2007—long before the results of the lab testing of K1 were returned on August 3, 2007.

Therefore, even assuming that K1, obtained through a grand jury subpoena was unconstitutional, trial counsel would be unable to present a successful motion to suppress the evidence obtained as a result of K3. The independent-source doctrine "holds that evidence will be admitted if the government shows that it was discovered through sources 'wholly independent of any constitutional violation.'" *United States v. Jenkins*, 396 F.3d 751, 757 (6th Cir. 2005) (quoting *Nix v. Williams*, 467 U.S. 431, 443 (1984)). Ultimately, the DNA evidence and identification of Petitioner would be properly admitted under the independent source doctrine, as the Government obtained a search warrant supported by probable cause, and not reliant on K1, to obtain a second buccal swab from the Petitioner. *See United States v. Allen*, 720 F. App'x 254, 258 (6th Cir. 2018) ("When there are two searches—an earlier illegal search and a later warrant search—evidence from the later search is from an independent source if the warrant application contains probable cause apart from the tainted information discovered during the first search."); *see, e.g.*, *United States v. Pugh*, No. 1:13-CR-16, 2013 WL 12099081, at *1 (N.D. Ohio Mar. 20,

2013) ("The buccal-swab warrant was based on information unconnected to Pugh's arrest, indeed information gathered *before* his arrest: the police surveillance and the evidence obtained while executing the valid motel search warrants. No information obtained during or as a result of Pugh's arrest was needed or used to secure the warrant; had the police never arrested Pugh, they still would have been able to secure the warrant. The legality of his arrest is therefore irrelevant.").

For the failure to file a suppression motion to constitute deficient performance, the meritorious nature of the motion must be so plain that "no competent attorney would think a motion to suppress would have failed." *Hendrix v. Palmer*, 893 F.3d 906, 922 (6th Cir. 2018) (quoting *Premo v. Moore*, 562 U.S. 115, 124 (2011)). The movant must demonstrate that counsel had no reasonable strategic rationale for not filing the motion. *Id.* (citing *Davis v. Lafler*, 658 F.3d 525, 537 (6th Cir. 2011)). Accordingly, the Court finds that Petitioner has failed to establish that his trial counsel, and consequently appellate counsel, were ineffective in failing to move to suppress, or challenge the failure to move to suppress, the buccal swabs taken from Petitioner on June 6, 2007 (K1), and July 27, 2007 (K3).

## V. CONCLUSION

For the reasons expressed herein, the Court **RECOMMENDS**[7] that the sole remaining claim in Petitioner's Motion to Vacate, Set Aside, or Correct Sentence Pursuant to 28 U.S.C. § 2255 [**Doc. 1**] be **DENIED**.

Respectfully submitted,

*Bruce Guyton*
United States Magistrate Judge

---

[7] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2) (as amended). Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); *see United States v. Branch*, 537 F.3d 582, 587 (6th. Cir. 2008); *see also Thomas v. Arn*, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the required time period waives the right to appeal the District Court's order). The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).